All right. The next case on the morning docket is in the matter of Estate of Edwin Ticknor, deceased 525-0501. Mr. Terlisi? Yes, Your Honor. Is that how you pronounce it? Yes. All right. You are representing the appellant? I am. Why don't you come up and tell us what you want to say? I will do that. Ed, please support the counsel. In this case, the appellant agrees very, very substantially with a lot of what the trial court found. Specifically, very clearly and very emphatically found that the respondent, Georgia Bumgarner, and her husband, Ralph, were totally not credible. And any reading of this record supports that. You could almost get the sense of Judge Steadman holding his nose as he wrote this opinion because he didn't want to come to this result, but he felt compelled to. And I think he did because he misinterpreted or misapplied some of the law here. And I could spend my whole 15 minutes, I think, going over some of the crazy, bizarre facts in this case. But I just want to focus on a couple of points that really go to the issue of law here. And the first one is the issue of the burden of proof, which was raised in a pretrial motion. The court deferred it until after the trial and never really made an express ruling on it, but clearly from the order itself put the burden of proof on the petitioner here, the appellant. Counsel, is it your position that that presumption of fraud should apply to each count? What it applies to, Your Honor, and the court very clearly pointed out and was absolutely correct that, well, if we set aside these transactions with the joint tenancies and the PODs, it comes back into the estate, but it already had because the power of attorney and the sister had removed him. So this issue is relevant as to one thing, and that is the $315,000 CD that was solely in Georgia Bungunner's name. So we believe clearly that she had the burden of proof by clear and convincing evidence to prove as a fiduciary, which she essentially admitted which the court found and is very well supported by the evidence, to prove by clear and convincing evidence that transaction was fair, that there was independent bias. You may recall in this evidence she purported to deny that she even knew this thing existed until she got a 1099. So your argument then that the court erred in not placing that burden would apply then with respect to the CD only? That's right. The first two counts pertain essentially to setting aside the will, but your argument really pertains to count three. You're absolutely right, Your Honor, and it's pretty much moot if the court upholds the will because all that does is bring the CD back into the estate, but it's a lot of money. It's significant. So with respect to the main issue, the will, the trial court found that Mr. Fickner, Edwin Fickner, was competent and had testamentary capacity. He very specifically says because he was able to successfully run his successful HVAC business. He was able to take care of his daily needs until he got very sick at the end, but at the time of execution of the will, he could do those things. And we acknowledge, and I think the case law clearly says, that a party can have bizarre, insane delusions about a subject that doesn't necessarily negate general testamentary capacity. You can believe that the moon landing was fake, that Elvis is still alive, and still have testamentary capacity, but the case law that we've cited in the brief is very specific, that when a testator without evidence of any kind imagines or conceives something to exist, which does not in fact exist, and which no rational person would in the absence of evidence believe to exist, an insane delusion affects the will or enters into its execution, the will has to be set aside. I'm going to give you a direct quote here. That where there is an insane delusion in regard to one who is an object of the testator's fountain, which causes him to make a will he would not have made, but for that delusion, such a will cannot be sustained. And I think that's the key difference. The trial court said, well, basically he's got testamentary capacity. There was evidence about the mini strokes, about a significant change in personality over the years preceding this will. But I would concede that that evidence alone would not have been sufficient to show lack of power. Counsel, I understand your argument as to counts one and two, and I've read the record. I know what the facts are. I read the course order in detail. I want to focus on count three for a moment if we could. Okay. And we've narrowed down here that the presumption of fraud, in your argument anyways, applies only to that count in the CD. So my question is this. Count three asserts that there were essentially two statutes that were involved with respect to this claim of financial exploitation. And that this presumption of fraud should be read into these two statutes. We decided a case in 2019, and I know it was before the time that you could cite this case. It was an unpublished order. Moldenhauer, as administrator of the estate of Narita Hermaling v. Dennison, Fifth District case in 2019. We specifically held that the presumption of fraud does not apply to a civil action for financial exploitation of an elderly person under 720 ILCS 5-17-56G. That's one of the statutes that you are relying on. And the reasoning was that the statute mandated proof by a preponderance of the evidence and set forth the statutory burden, but did not include any presumption of fraud in the statutory text. So that would seemingly apply then to the other statute, 755 ILCS 5-2-6.2B that you have cited in count three, which also includes the similar preponderance of the evidence language, but does not include any presumption of fraud. So my question is, were we wrong in Dennison? Or how do we get around that case? Has this been the case that was cited in the briefs? It was not cited in the briefs. Okay. We need to give them an opportunity to respond to your question.  I can respond. I can do that. Would you like an opportunity to respond? Well, not really, because I would never suggest that this court was wrong. Oh, well, I understand that this was a pre-Rule 23 case that you would not have been able to cite. Neither of you would have been able to cite it in your brief. So, to ask it on the fly, as the presiding, I'm going to ask you, Mr. Chilesi, and your opposing counsel, would you like a citation on this so that you can respond to the question? By some supplemental brief? Yes, we would give you an opportunity to file a small response, which is usually five pages. Okay. The top, and you would respond to Justice Olinger's question. Sure. And there's an audio of this, so if you miss the question, you can ask it, or listen to the audio, and his question will be on there. Absolutely. So, if you would like an opportunity, we'll give you that. I would not decline that opportunity. Okay. Would you give the citation? Yes, I will, and I apologize. I did not understand that that was a typical procedure. The site is 2019 Ill at Fifth, 180212-U. 212-U. It's a Rule 23. It's before the precedential opportunity to cite it. What was the name of the page? Moldenhauer, M-O-L-D-E-N-H-A-U-E-R, as administrator of the estate of Norita Hermaling, H-E-R-M-E-L-I-N-G, versus Denison. Do you want to restate your question? So, the question is that in Denison, we held that the presumption of fraud does not apply to a civil action for financial exploitation of an elderly person under 720 ILCS 5-17-56G. We found that the statute mandating preponderance of the evidence as the burden of proof should not have the presumption of fraud read into it. Thank you. You know, that really rings a bell. I halfway think I was a part of that case and represented one of those parties. Okay, and just for the record, the order of the court will be that you have seven days, Mr. Talese, to respond to the question. You are limited to five pages, and your opposing counsel, Ms. Reinhart, will have a likewise seven days, and there will be no reply. Thank you. Okay? I understand. All right. Just so I understand, Mr. Talese will have seven days, and after he files his five pages, I will have the additional seven days after that to file? Correct. So that you can respond. Okay, thank you. But there will not be allowed any Rule 23 cases that do not comply with the Rule 23 statute. So just because you've been asked about a pre-applicable Rule 23 does not give you license to go back and cite more Rule 23s that don't comply with our new Illinois Supreme Court rule. Does that make sense? Yes. Okay. All right. Now we have the procedural issue out of the way. I would just want to make very clear for the record, of course, that the count three that Your Honor is concerned with, the exploitation count, is, of course, a wholly separate and distinct cause of action from the will contest. And your argument, Mr. Talese, as I understand it, is if we find that the testamentary capacity was not, as the Court found, then the will would be avoided. That's correct. Now, why is it that you say this delusional? Why was he delusional? Because it seemed like there was no evidence that he was delusional. Well, we think there clearly was. And what would that have been? Well, a couple things, Your Honor, several things. One is not long before this will was executed, he suddenly, we have to keep in mind that the appellant here, Kevin, is his only son, that he helped his father all the time in this HVAC business, helped build the business, got a refrigeration license so he could do so, worked for all these Casey stores all over the Midwest. And suddenly, out of the blue, Mr. Tickner, Edwin, was incensed and said that Kevin had gone to a Casey's in Hillsboro, had impersonated him, and had intentionally tried to screw up the job to mess up his business. Now, even Georgia says that was a bizarre belief. She knew that was crazy. She didn't use the word crazy, but she did use the word bizarre and paranoid. And it's clear on this record that it was. I mean, first of all, there would obviously have been no motivation to do that. Was there any medical diagnosis even introduced into the record to show what the decedent was suffering from in terms of his inability to understand what he was doing at the time that he executed the will? Well, the only evidence in that regard is testimony from his sister, Linda Walker, and I believe also from Georgia, acknowledging that his doctors had told him in their presence that he had had a series of mini strokes. And so that was prior to the will being executed? Prior to the will, yes. But how that affected him, there's no medical evidence in the record? That's right. That's right. The other, what we would characterize clearly as an insane delusion, because as the court has defined, that's something that no rational person would believe, is his belief out of the blue, because somebody told him that Kevin, his only son, his only natural object of his bounty, had gone around recruiting women from high school days. This is a 70-year-old man, a 68-year-old man at the time, to come forward and say, I had his child, I'm going to sue him for child support for all these years and bankrupt him. Now that is so far beyond the pale. Georgia agreed that was a bizarre, delusional, paranoid thing. When did that happen in relation to the execution of the will? Before. I know, but how long before? That's not precise. Aren't we concerned about his state of mind at the time he executed the will? What is the evidence as to his ability to understand at that time? The business about trying to sabotage his father's business by going to the Casey's, I think the evidence said it was in 2017 and this will was in 2018. I'm not sure we were as precise on the allegations about recruiting the women to say they had his child. Why wasn't the lawyer called in this case? Boy, I'd like to know the answer. Because he didn't have the chance to call the lawyer because they had executed a waiver of consent. Yes, in fact, and that was done pursuant to our request that he was discovered that situation. Why not call the lawyer? And then it came out they did not disclose him as a trial witness until like two weeks ago. Okay, but you could have. I could have, but certainly I would presume it would be bizarre for a lawyer who drafted a will to testify adverse to that will. So why would I? I mean, you have the credibility and determination to be made. At least talk to the lawyer and see whether he's going to be adverse to you. He could have at least told you what the position of detestator was at the time he executed the will. Of course, but I can't. You can't argue in your brief that they didn't call the lawyer when you had the chance to call the lawyer. I could have. It would certainly strike me as incredible if Mr. Blank is a very experienced, respected, probate lawyer, that any lawyer that you would call on a will contest when he drafted the will would testify adversely to that will. But that's what you're asking us to do. You're to make us presume that he would have testified adversely in your client's favor, correct? Well, and that's what IPI 501 says. But that's the missing witness rule only is effective if you have control over the witness. And I don't know that the fact you hire a lawyer means you have control. Do you have a case that says that? Well, I have a language. 501 says a witness is not equally available to a party if there is a likelihood the witness would be biased against him as, for example, a relative or an employee of the other party. Yeah, but that's not a hired independent agent. I've not seen it used under those circumstances, especially when you have the ability to call the lawyer. Either side here could have called the lawyer.  So I don't know that the missing witness rule would apply 501. Well, I think it does under the terms of 501 because there's a likelihood the witness would be biased against him. I can't imagine Mr. Blake wouldn't have been biased in favor of the will he wrote. Well, but that's what Justice Bollinger is asking you to have us assume under the missing witness rule when you had equal opportunity. Which the court says. I suppose in every case where there's a missing witness, the other party could have subpoenaed that witness. But it's different when you have an employee, for example, and you don't call the CEO or the CFO or, you know, the person who's keeping track of the records. Yeah. Hard to say in response to that, Your Honor, is that, you know, the IPI says that it's likely that it clearly would be biased. And that doesn't constitute equally available. But regardless of whether that 501, IPI 501 presumption applies, I think there should be an adverse influence that you would normally certainly anticipate that the drafter of the will would support the will and give reasons for this will as to, you know, why he would give an eight-generation family farm to a 13-year-old girl, including land that's in a limited partnership that he knows he doesn't have the lawful right to do. But on the other hand, he could also answer numerous questions that could have been posed to him about what was the decedent's manner, what did he talk about, I mean, so many questions that he could have been called to, you know, answer. He certainly could have. And I think we could just put it this way. If Mr. Tickner had walked into Mr. Blake's office and said, I want to wholly disinherit my only heir, I want to give this family farm of eight generations that's tied up in a limited partnership to another 13-year-old girl, I want to give over a million dollars of cash assets to this paramour of mine that's married and living with her husband and all that, and Mr. Blake would have asked the question, well, why? I mean, there should be some reason. Well, because my son, who helped me in my business all these years, impersonated me and tried to destroy my business. He tried to get women from 50 years ago to testify they had a kid with me and sue me and bankrupt me. And I can't imagine any lawyer under those circumstances would draft it and say, okay, fine and dandy. That's an insane, that's a bizarre allusion that goes directly to the reason as to why he disinherited his sole object, the natural object of his biology. Okay. Mr. Shalizi, your time is up for right now. Okay. Do you have any more questions? No questions. Not right now. Thank you. You will have the right to a rebuttal. So we're going to give Ms. Reinhart an opportunity to thank you. Okay, Ms. Reinhart. Good morning. May it please the Court, Counsel. I think the overriding factor in this case really deals with participation as it leads to the fraud claim as it relates to the nonprobate assets. The presumption of fraud really goes to what is fraud at a basic level. Is it an intent to deceive? There's a presumption of one's intent as to their actions. All of the cases cited by both parties in this case dealt with an element of participation. In this case, there was no evidence presented by Kevin that Georgia was involved in changing the beneficiary designation of the certificates of deposit, involvement in titling the vehicles. The participation is an absolute necessary element in all of the cases. The Miller case that's cited by both parties wherein in that case the sister who had acted under a power of attorney and actively participated in cashing out CDs and giving the money to various family members and was ultimately ordered, and that was affirmed by the appellate court to return those funds to the estate, she actively participated. Now, the Miller case sort of glosses over the issue of participation. I would submit to the court that that was done because they were talking about more so addressing the issue of CDs that the agent in that case were allowed to keep that she had found in the safety deposit box where she was either a joint owner or a beneficiary in that case prior to the agency relationship being established. But the Miller case cites to Thiel, it cites to Feinberg, it cites to Dijonet. All of those cases require for a presumption of fraud to apply when an individual who is an agent or in a fiduciary relationship to have that presumption of fraud shift to them that there's active involvement. Counsel, the CD was opened up while your client was the agent under powers of attorney for the testator. It was opened up at a bank, and it was opened up in her name. And the evidence is unclear in terms of how that happened. Is that fair? The evidence is not clear, Your Honor. Bank tellers were not called. I mean, no one from the bank was called to testify as to what had happened, how they allowed that to happen without the involvement of your client. No. None of those individuals were called. And, Your Honor, my client's position is that there must be some sort of showing of participation by the individual in the fiduciary relationship or the agent under a PLA before a presumption of fraud shifts to her. If not, it's illogical. You're ignoring or the court would be ignoring the requirement that once the presumption is shifted to the responding party, Georgia would have had to prove that she had disclosed the nature of the transaction prior to it happening. She would have had to have proven that she paid consideration, that the principal had independent legal advice. How is someone to disprove those things when they were not involved? There was no undue influence count. In other words, no condom count to set aside this CD, this transaction, based on undue influence. Correct? There was no separate count. No. The undue influence claim dealt specifically with the will. And I addressed that in the brief because it wasn't clear, but I think Mr. Chilizzi has explained to the court that that wasn't asserted today. But if there was a separately set undue influence count and your client was the agent under a power of attorney with fiduciary duties and the CD was opened up mysteriously in her name, would that not create a presumption of fraud? No. If the court looks at all of the cases that have been cited, even the underlying cases in Miller, the Ribot case and the Simon case, all of those cases require participation of the agent or the individual in the fiduciary capacity. An agency relationship doesn't necessarily require it. It's the fiduciary capacity or fiduciary relationship. Simon, the Simon case. So being a power of attorney would create the fiduciary relationship? I'm sorry? The fact that she was power of attorney creates the fiduciary relationship? Absolutely, as a matter of law. That is undisputed. I'm addressing that issue because I believe the reply brief talks about the difference between a fiduciary relationship that exists because of just the nature of the relationship of the parties that the court can find versus one that's created as a matter of law when you've got a power of attorney creating an agency relationship. But the Miller case goes on inside Tribot and Simon. And Simon specifically says that the presumption of fraud applies when the agent or the individual in the fiduciary capacity is actually engaging in the transaction. There was absolutely no evidence of that presented by Kevin at the trial court level. There had to have been some sort of prima facie showing of that before that burden or the presumption of fraud shifts to Georgia. So the crew of active participation then by your client, what would that involve? Were she denies it? Calling the bank Miller? People from the bank involved in that opening of the sea? Or how would they go about that? I think the trial court in its decision actually noted that, you know, a bank teller could have been called. They could have gotten the actual CDs and presented the signature cards, those sorts of things. Georgia didn't have the initial burden of proof to show lack of participation. The participation element must first be shown by the petitioning party, which was Kevin in this case, that is asserting that there was some sort of nefarious conduct or something of that nature. And it goes back to what I indicated early on in my argument that, you know, what is fraud? At a basic level, it's an intent to deceive. There's got to be some sort of allegation at least that she participated. There was no allegation that she participated in any of this. There was no evidence that she participated in any of this. I don't understand how somebody can open a CD without the beneficiary of the CD being notified or a part of that. It appears so, and I think that Mr. Tillerson notes that in the regulations regarding opening that up, that the bank would have had to have Georgia's information, but the law indicates that it's after. After those things are created, the bank then must verify social security numbers, those sorts of things. So it is feasible that the decedent in this case could have opened up those CDs and Georgia found out about it later had it provided to the decedent the information or to the bank after the fact or social security number, identifying information, things like that. Is that a participation? When you look at all of the cases that I've referenced, that's active participation in the transaction of placing themselves as a beneficiary or transferring funds to their benefit. They're actively engaged leading up to that, and that would be why the presumption of fraud, once it's there, then the responding party has to show that there was full and fair disclosure prior to those things, that they had independent legal advice prior to those transactions taking place. There was no evidence of that. Kevin bore the initial burden. He failed to produce that. We don't know if the teller just ignored the regulations. It very well could have been. Absolutely. There was no evidence presented, and it wasn't Georgia's burden to prove that. Kevin needed to prove those things before the presumption of fraud attached. It's the same thing with the capacity issue that has been raised. The lack of capacity in a will contest is very straightforward. The burden of proof is always on the petitioning party. A will is always presumed valid. An individual is always presumed to have capacity. When asked at the time of trial if Kevin had any evidence of his father's lack of capacity, at the time the will was executed, he said, I don't have any evidence of that. While at the time of the execution, Eddie's behavior can be considered, and the trial court found in the evidence was that Eddie was running a very successful business at that time. He was running a successful business up until the time he had his heart attack. He had his heart attack. While he was working, he conducted his daily affairs of life. There's no evidence whatsoever that he had illusions or was paranoid. There was evidence that Eddie was perhaps- Do you have any case that says based on the facts alone, you can find delusional behavior, as Mr. Jalisi is arguing? I don't have anything else. No medical, no- There's nothing in the record, and the burden is on Kevin. The burden was never on Georgia to prove that the decedent had capacity. She literally could have sat silent at trial and presented no evidence, and if Kevin failed to produce sufficient evidence, the will is deemed valid. It continues to remain valid. But I think his argument is that the facts speak louder than the expert witnesses could speak. In other words, you don't just disinherit your only son and give somebody, a 13-year-old, a farm that's been in the family for- So he's using the old maxim that the words themselves, the acts, if you will, speak louder than the words. And I would draw the court's attention to Enray, the estate of Feinberg. Eddie had the right to disinherit his only child from his will. Case law holds that, you know, testamentary capacity cannot be denied based on an individual's decision to disinherit their family. The trial court found that Eddie considered Georgia a life partner. It may have seemed bizarre to everyone else, but they were friends in excess of 30 years. They went on vacation together. They spent holidays together. It may seem bizarre. The court found that it was more than a platonic relationship. Georgia denied that at the end of the day. I think perhaps the finding that it was more than a platonic relationship actually strengthens Eddie's desire to leave his entire estate to the individual that he considered a life partner. Didn't the trial court find that the decedent had actually placed an asset in her name some time ago, a business asset, a vehicle? It was back in 2006. One of the vehicles that he still had at the time of his death was jointly titled. And there was a long, consistent pattern of entanglement between the two of them. Now that, you think, could be considered, correct? I'm sorry. The fact of the length of the relationship between she and the decedent could be considered as part of the court's findings, correct? Correct. And like I said, I think it bolsters why he did what he did. It wasn't some sort of insane delusion at the end of his life. He had been doing this for years. Anything else?  Thank you. Thank you for your comments, Ms. Reinhart. Mr. Toblizzi? Yes. With respect to the $315,000 CD that was just in Georgia's name, we have a judicial commission that she participated. At 363 of the common law record, request to admit number 26. On or about March 28, 2021, you opened a certain certificate of deposit, number such and such, at People's National Bank in the amount of $315,000. The next one admits that those were Eddie's funds. So she has judicially admitted that she, on that day, she opened a CD at People's National Bank. And that was a request to admit? That's a request to admit at 363 of the common law record, the CD that's in the record. Okay. Thank you. And with respect to capacity, again, I think the court, the case law, has made a clear distinction between somebody who could, you know, be walking around, appear perfectly normal and natural, or maybe even having some crazy, irrational thoughts. But as stated here, you know, an insane delusion is one where someone imagines or conceives something to exist which no rational person would, in the absence of evidence, believe. And now, would any rational person believe that their son, who worked side-by-side with them in this business for years and years and years, would go out and impersonate them and try and sabotage his business? And even the mere thought, I don't think you need expert evidence to say that it's a bizarre, insane delusion to think that your son, again, is trying to get women from 50 years ago to say they had an illegitimate kid with him and bankrupt them on their face. And, in fact, Georgia admits in this testimony. There's no basis for that. She didn't believe it. It's bizarre. It's delusional. It's paranoid. And if that's the case, if the insane delusion is with respect to an object of the bounty, then which causes him to make a will which not have been made for that delusion, such will cannot be sustained. Now, the argument is, well, he would have made this will anyway. But clearly, if he had wanted to benefit Georgia some, certainly. But certainly, under these facts, that had to come into play. Of course you can disinherit your relatives. If Kevin and him had been estranged or whatever, but you can't on the basis, it's just not to be upheld on the basis of some clearly bizarre, clearly deranged delusion about that person. And, again, he sat down, and no lawyer would have drafted this will if he had come in and said, my son has worked with me all these years to build this business up, tried to bank it. Counselor, I just want to get back to this response to request to admit facts again. I know I read it. I don't have it in front of me at the moment. Did the defendant specifically admit that she was present when that CD was opened at the bank, or did she admit that the CD was opened in March of 21 with the deceased's funds? The request, I'll just cite it directly. On or about March 28, 2021, you opened a certain CD, number such and such, at People's National Bank in the amount of $315,000. So I think at that point, with the fiduciary relationship admitted, that put the burden on her to prove by clear and convincing evidence that it was fair, there was independent advice, and so on. And the answer was she admitted to that unequivocally. Absolutely. Does your request to admit define the word you? No, but it's directed towards Georgia. Georgia. Absolutely. She signed and verified it. No global definition for you? No. Okay. Does that conclude your remarks? Yes, it does. Just a moment. Let me bring this back up. Okay. We have nothing further for our speaker party. Thank you for your argument here today. Thank you so much. We appreciate it. We'll look forward to your responses, and then after those are received, an order will be issued in due course. But meanwhile, the case will be taken under advisement.